# United States District Court
## Eastern District of Michigan
## Southern Division

**Pamela S. Anton,** an individual
      Plaintiff,

vs.

**SBC Global Services, Inc.,** d/b/a
**Ameritech Information Systems,
Inc.,** a/k/a **Ameritech,** a/k/a
**SBC/Americech,** a Delaware corporation,
      Defendant.
_____/

**Civil Action No. 01-40098**

**Honorable Paul V. Gadola
Honorable Steven D. Pepe**

**Cheryl Freeman Snipes,** an individual
      Plaintiff,

vs.

**SBC Global Services, Inc.,** d/b/a
**Ameritech Information Systems,
Inc.,** a/k/a **Ameritech,** a/k/a
**SBC/Americech,** a Delaware corporation,
      Defendant.
_____/

**Civil Action No. 01-40213**

**Honorable Paul V. Gadola
Honorable Steven D. Pepe**

## Opinion & Order
### Regarding Plaintiff's Proposed Exhibits #27 & #28 (Dkt. #143)

Because the issues involved in the arguments and submissions concerning the

Defendant's motion in limine to strike Plaintiffs' proposed Exhibit #27 (demonstrative

aids/exhibits regarding damages calculations) and Exhibit #28 (demonstrative exhibit - a

"straight line" economic model of LCR assuming orders pursuant to the CCI agreement

schedule) are relatively complex, and are central to Plaintiffs' potential proof of damages, this matter is being analyzed in a separate order for the convenience of the parties and Judge Gadola's review of any objections to it.  The other motion items in Plaintiffs' and Defendant's motions in limine were resolved more readily with the assistance of a couple hearings.  Yet, the order on those has been deferred pending resolution of Exhibits #27 & #28 (or some variant thereof) so the time for objections would run on all portions of the motions in limine at the same time for a single review by Judge Gadola.  Extensive in person hearings were held on November 22, 2005, on January 20, 2006, on April 18 and 19, 2006, and a telephonic hearing was held on August 4, 2006.  Prior to the last hearing, multiple e-mails were exchanged between the undersigned and the parties with numerous questions concerning prior compensation practices being asked and answered, and supplemental evidence on the issues provided to the Court.  Also, because Exhibit #27 involves blow up and/or Power Point documents which the parties have apparently agreed to exchange two weeks in advance of trial to allow for objections, this opinion focuses on Exhibit #28 and more generally the broader issue of calculating damages.

I. <u>Background</u>:

Plaintiffs contend that based on prior representations and a past course of dealings, they have an implied in fact agreement with Defendant SBC Global Services, Inc. ("SBC") regarding the base to which their respective commission rates (.6% or .66%) and any bonus compensation for Plaintiff Anton applies for any new contracts they are involved in developing for SBC. Plaintiffs assert that commissions apply to (1) the full face value of the contract (2) at the time it was signed and (3) assuming full performance by the parties to the contract.  In other words, Plaintiffs contend that in the past Life Cycle Revenue ("LCR")  was determined "on contract" by

computing "the aggregate projected revenue over the term of the contract assuming full performance by the customer" and not by determining what would be recovered in the case of a breached contract (Plaintiff's response to Defendant's motion in limine, at pp. 21 & 28).

They wish to use proposed trial Exhibit #28 to establish this aggregate projected revenue or LCR over the term of the CCI contract which is in dispute. Proposed Exhibit #28 assumes sale and installation of DSL lines by CCI in a steady progression in year one September 29, 2006, of 12,000 lines per month from zero to 180,000 at the end of the first "contract year" (which Plaintiffs contend is 16 months under the CCI Agreement). This 180,000 of DSL lines is the volume level commitment for the end of year one of Plan Level D which CCI chose. These progressive putative monthly sales are then multiplied by $30 per line each month to provide a monthly revenue amount which is aggregated for the year. In contract years two through four, proposed Exhibit #28 assumes sale growth and installation of DSL lines by CCI at an increased number of 15,000 lines per month to meet the year end volume level commitments of 360,000, 540,000 and 720,000 for years two through four respectively. [1] These putative sales are again

---

[1] Proposed Exhibit 28 appears to misread the CCI Agreement. The CCI Agreement is a 51 month agreement ending with a minimum of 750,000 lines sold at the end of its term, not 720,000 as proposed Exhibit 28 anticipates. Section 2.4 defines the first contact year as 15 months and the remaining years as 12 months in duration. It may be that this 51 month contract anticipates month end volume level growth averaging a minimum of 12,000 lines over the first 15 months (180,000), and then averaging a volume level growth of 15,000 lines per month for the next 24 months and a minimum of 17,500 for the final 12 months. This would achieve the 180,000 volume level commitment for the end of year one (15 months), the 360,000 volume level commitment for the end of year two, the 540,000 volume level commitment for the end of year three with and the 750,000 volume level commitment for the end of year four. Any computational errors in Plaintiffs' proposed exhibit are remediable assuming an adequate foundation is laid for introduction of this demonstrative exhibit. The relevant question for this motion in limine is whether Plaintiffs can use as an exhibit any formula using a straight line progression for each year with increasing slopes for increased volume level commitments over the years.

3

multiplied by $30 per line per month and aggregated yearly for the term of the contract indicating a life cycle revenue of $537,300,000.00.

Because past customer contracts Plaintiffs sold for SBC involved a fixed number of products or services generally at a fixed monthly rate for a fixed term, this LCR was easily determined shortly after the signing of the contract.  From this LCR, any commission and bonus payment could be calculated.  Defendant contends that the June 29, 2000, DSL agreement was a wholesale volume purchase agreement with a "distributor and/or reseller," not an end user, as the prior contracts.  This wholesale DSL contract was novel, and was sufficiently different in kind and quality from the prior contracts Plaintiffs have been involved in at SBC that these prior contacts and their commission formula cannot provide a sufficient basis for a jury to find an implied in fact contract related to the June 29, 2000, CCI contract.  The CCI contract had no clear number of DSL services provided each month and thus no monthly revenue commitment could be determined "on contract."

Defendant argues that "the typical monthly-obligation-times-duration [formula] used to calculate value of the contract and determine commissions cannot be used" (Brief on Defendant's Motion in Limine, at p. 4).  It objects to Plaintiffs' proposed Exhibit 28 demonstrating a method of calculating LCR on the CCI DSL contract, as speculative and an unsubstantiated hypothetical for which there is no foundation.  Defendant notes that "a plaintiff is not entitled to an award of damages unless both the act of damages and the amount of damages are established with reasonable certainty; neither may properly be based upon mere speculation,

4

guess, or conjecture."[2]

II. The June 2000 CCI  DSL Contract:

While the CCI contract had a fixed term (51 months) and a fixed monthly rate per DSL line installed (albeit at a lower wholesale amount of $30/line/mo.), the CCI contract was indeterminate as to the number of lines per months that would be in service.  Without this, Defendant contends that the LCR cannot be determined "on contract" for any amount beyond the minimum revenue commitment which is clearly determinable from the face of the CCI contract in Section 5.  The CCI contract required that CCI "shall order" DSL service to be repackaged and resold to end users.  In the contract, CCI committed to Plan D that had annual targets of "minimum number of DSL service installed" of 180,000 lines at the end of 15 months (Year #1), 360,000 at the end of Year #2 (27months), 540,000 at the end of Year # 3 (39 months) and 750,000 at the end of Year # 4 (51 months).

There is a dispute among the parties over the characterization of these targets as to whether they were contract "obligations," "commitments" or "guarantees."  Section 17.5 of the June 2000 CCI contract on termination liability uses the term "minimum volume commitment." It provides that upon termination liquidated damages are calculated as $30 (Monthly Charges for

_____

[2] *Zirin Laboratories Int'l, Inc. v. Mead-Johnson & Co.*, 208 F. Supp. 633, 635 (E.D. Mich. 1962) (citing *Keogh v. Chicago & Northwestern Ry. Co*, 260 U.S. 156 (1922)).  In *Grantham & Mann, Inc., v. American Safety Prod., Inc.* 831 F.2d 596, 60-2 (6th Cir. 1987), the court held that even where the fact of damages is established "recovery is properly denied if the plaintiff fails to provide 'a sufficient basis for the jury's computation of damage,' *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 266 (1946), by 'furnishing data from which the amount of the probable loss could be ascertained as a matter of reasonable inference.' *Eastman Kodak Co. v. Southern Photo Materials Co.*, 273 U.S. 359, 379 (1927)."  A plaintiff must provide sufficient evidence "in the record to permit a fact finder to draw reasonable inference and make a fair and reasonable assessment of the amount of damages."  *Id.*

5

768 Kbps) times "the minimum volume commitment" times the months remaining under the contract.  Defense counsel asserts that the termination provisions of Section 17.5 are not relevant for two reasons.  First, CCI did not terminate the June 2000 contract but just did not order any DSL lines.  Thus, any CCI liability would be calculated under Section 5, not Section 17.5.  Second, because the liability under both Sections 4 and 5 is  less than that of Section 17.5, no reasonable party would terminate, thus this section would never be utilized.  Plaintiffs' counsel argues that all language in the contract is to be considered in contract interpretation.

If the June 2000 CCI contract is ambiguous, allowing evidence beyond it, Plaintiffs have a document showing that the Director of the Large Business Section on April 28, 2000, sent an e-mail while the contract was still being negotiated noting "Colin's commitment of 750,000." (Plaintiffs' proposed Exhibit #9).  Also, after the contract was signed, Data Sales Manager Joseph Liginski wrote an e-mail noting that CCI was signed up for "750,000 DSL lines" (Plaintiffs' proposed Exhibit #14).  Yet, it is clear from the CCI contract that these targets were not traditional contractual "obligations," "commitments" or "guarantees" between CCI and SBC warranting full performance damages because the CCI contract has provisions for "Shortfall Liability" in Section 4  and "Volume Threshold Failure Liability" in Section 5 determining lesser liability than full performance damages if the targets were not met to a sufficient degree.[3]  As noted in both of the March 2004 Reports and Recommendation in this matter, if one assumed that no lines were sold, that maximum measure of damages was $15 million under Section 5's Volume Threshold Failure Liability.  Thus these provisions served as a sort of liquidated

---

[3] Section 5 imposes liability if at 3 months into year 3 of the contract 60% of the year 2 commutative minimum number of DSL service lines are not achieved.

damages if CCI fell short of meeting the targets to which it had committed in the agreement. Defendant contends that this $15 million minimum guaranteed revenue is the maximum appropriate LCR upon which Plaintiffs' commissions should be determined.

While it is clear that *assuming total non-performance by CCI,* the maximum revenue available to SBC was this $15 million, the clarity of this liquidated damages limit in the CCI contract is not determinative of the method of determining LCR of that and other contracts because, if Plaintiffs prevail on their implied in fact contract claim, that method of determining a contract's value is set by their separate employment compensation contracts with SBC. These employment contracts of each Plaintiff, not the CCI contract directly, form the basis of Plaintiffs' claims.

III. Defendant's Position on Compensation:

Defendant SBC Global Services, Inc. ("SBC") contends that the commissions owing on the June 2000 wholesale DSL agreement with CCI is this "minimum revenue commitment" of $15 million, and thus, at a maximum, the LCR for commission purposes should use this figure. While many other SBC superiors involved with Plaintiffs never had heard of this "minimum revenue commitment" prior to this dispute, it is not an unreasonable target point for an employer to select to determine the minimum LCR of this CCI contract assuming that this unbridled employer prerogative was reserved to the Sales Compensation Team, as Defendant contends the 2000 Sales Compensation Plan provides. It would also give Plaintiff Anton a $90,000 commission for 2000 on top of her base salary ($36,000 in 1999) and Plaintiff Snipes a $99,000 commission on top of her base salary.

Thus, Defendant will prevail with respect to either or both of the respective Plaintiffs if:

(1) Defendant can persuade a jury that plaintiff(s) had reasonable notice and access (or actual access) to the 2000 Sales Compensation Plan (or 1999 Sales Compensation Plan) on Lotus Notes with its "large sales exception" giving the Sales Compensation Team nearly unbridled discretion in setting the commission on large sales; or (2) if Defendant can persuade a jury on its argument that the June 2000 CCI wholesale DSL contract was sufficiently different from the prior contracts Plaintiffs were involved with for Defendant, that the prior course of dealing with those contracts is insufficient to demonstrate an implied in fact contract concerning the June 2000 CCI contract.        Defendant's current motion in limine is related to this second theory of the Defendant.  Defendant seeks to exclude evidence demonstrating a means of calculating Life Cycle Revenue on the June 2000 CCI contract because of the asserted critical differences in the CCI wholesale DSL contract. This is, in effect, a motion for summary judgment based on the argument that there is insufficient evidence of a prior course of dealing between the parties from which a jury could find an implied in fact agreement on how to calculate Life Cycle Revenue on a contract such as the June 2000 CCI wholesale contract, and thus there is no implied in fact agreement on how to calculate commissions on the CCI contract.  At the final hearing on this motion and in certain e-mail submissions, defense counsel acknowledged that in his earlier motion for summary judgment he had focused on the difference in the type of product – wholesale DSL – and different type of contract – volume purchase discount agreement.  Those challenges were directed at the sufficiency of the evidence to find an implied in fact contract between the parties, but had not focused on the sufficiency of the evidence on determining Life Cycle Revenue and commissions on a contract such as the 2000 CCI contract.        A  motion in limine should not be a surrogate for a motion for summary judgement and Plaintiffs seek an

opportunity at trial to lay a foundation for the introduction of Exhibit #28, which it is believed they should have.  Yet, because the issue will rise again at trial, and because so many followup arguments and submissions have been made on this issue, this opinion elaborates on the matter so the trial judge can consider this matter with the opportunity for greater reflection than is sometimes available in the midst of a trial.

IV. Plaintiffs' Position on Compensation

 Plaintiffs contend they were not given reasonable or actual notice or access to the 1999 or 2000 Sales Compensation Plan with their provisions for a large sale exception and for the unchallengeable prerogatives of the Sales Compensation Team to determine life cycle revenues and commissions.  Rather,  Plaintiffs contend that based on prior representations and a course of dealings, they had an implied in fact contract in which LCR for purposes of determining compensation was based on *an assumption of full performance of the contract,* and not based on *an assumption of non-performance* as the Sales Compensation Team chose.

Plaintiffs point to various prior contracts in which they were paid commission on the life cycle value of the contract assuming full performance, and several of these contracts had liquidated damages clauses limiting damages if there was non-performance by the customer. Apparently in a sea of silence of anyone noting or warning of the "large sales exception" or the unchallengeable prerogative of the Sales Compensation Team to set commissions, Plaintiffs proffer substantial evidence of their SBC superiors touting extraordinary DSL numbers and dollar values for this 4 year CCI DSL contract.[4]  Plaintiff Anton noted at her deposition that

---

[4] An  April 28, 2000, e-mail from Large Business Director Patrick Reay, while the agreement was still in negotiations, noted "Colin's commitment of 750,000 DSL lines" (Plf. Exhibit # 9).

Sales Manager Joseph Luginski joked that there were not enough zeros in his calculator to calculate her commission (Anton December 28, 2001, Dep., pp. 114-15). She also asserted that before the CCI contract was signed when she asked divisional President and Sales Compensation Team member, John McNulty "how are we going to get paid on DSL, . . . he said exactly the same . . . . You'll be paid exactly the same on DSL " (*Id.* at 115-16).

Most of these statements are not binding admissions of Defendant, because (1) as noted below, many of these valuations are wildly exaggerated and based on unrealistic premises, and

---

An June 29, 2000, Sales Tracking Transmittal signed-off by Data Sales Manager Joseph Luginski referred to the CCI contract as involving a quantity of 750,000 and having a value of $1.08 billion (Plf. Exhibit # 19).

In a June 30, 2000, e-mail Data Sales Manager Joseph Luginski noted the CCI contract was signed for "750,000 DSL lines" with a "LCR (depending on how you calculate it) [being] somewhere in the neighborhood of $500,000 to $1,000,000" (Plf. Exhibit # 14). He later completed a GBS CIM Cover Sheet (CIM is Contract Information Management) noting a Net LCR of $259,2000,000 (which appears to use 180,000 DSL lines x $30/month x 48 months.) (Plf. Exhibit # 16).

On June 30 Sales Manager Frank Klimko noted the CCI contract was "for a conservative 5.4 million net new revenue commitment for the first year" (referring to Net New Monthly Revenue ("NNMR") apparently computed on 180,000 DSL lines x $30/month = $5.4 million/month.). He repeated that in the "June bookings."

In two July 18, 2000, e-mails, Mr. Klimko referred to Pamala Anton's deal with Colin Communications being the "largest DSL contract in Ameritech's history" and noting "James Colin signed an agreement for 750,000 DSL lines . . . " (Plf. Exhibit # 15).

An SBC "BCS Newslink ("BCS" refers to SBC's Business Communications Services) of August 9, 2000, (Pft. Exhibit # 18) referred to"a whopping 750,000 DSL wholesale lines [being sold] to Colin Communications, Inc.," "at a minimum 180,000 lines per year, BCS could see revenues exceeding $15-20 million in 2000 alone and an additional $270 million by year-end 2001. The contract, as a whole, is worth more than $1.1 billion!" (Plf. Exhibit # 18).

On October 10, 2006, at a Data Jam for employees President of Sales for Ameritech BCS, Mike Hamilton noted:

Without a doubt, the DSL Sale of the year belongs to the Michigan team, who sold some 750,000 wholesale lines to Colin Communications. That four year contract is worth one billion dollars.

(Plf. Exhibit # 22).

An October 12, 2000, e-mail from Data Sales Director Evan Parke notes that "Mike Hamilton announced the 'one Billion' again at the DataJam" (Plf. Exhibit # 15).

10

(2) because, other than Mr. McNulty, none were made by SBC's personnel involved in determining life cycle revenues and commissions.  Nonetheless they do demonstrate an atmosphere surrounding Plaintiffs in 2000 that manifests "understandings" or "misunderstandings" consistent with the asserted claims of Plaintiffs as to how they would be compensated on the CCI contract and on its extraordinary size and predicted value.  Thus, such evidence is relevant to what a reasonable employee in Plaintiffs' positions might have believed as to their agreement on compensation, even though this understanding must have preceded the June 29, 2000, CCI contract to form an implied in fact contract related to the June 2000 CCI deal.

V. <u>Plaintiffs' Prior Course of Dealing with Defendant Regarding Compensation</u>

Plaintiff Freeman Snipes began working with SBC[5] in July of 1997 as a retail consultant in the Cellular Retail Sales Division, selling pagers and cellular phones.  After a series of promotions, Plaintiff transferred to an Account Executive ("AE") or Universal Account Executive ("UAE") position in SBC's Business Communications Services ("BCS") Small Business segment, where she was to solicit new business for SBC.  Plaintiff was acquainted with the head of CCI since 1984.  She began her work with CCI in May of 1999, and in February 2000, Plaintiff was promoted to Territory Manager ("TM") in the Large Business segment of the BCS group to act as liaison and contact person.  Her title changed apparently because there were no "AE's" or "UAE's"  in Large Business, but her job functions an method of compensation were the same – a base salary and commissions.

---

[5] Plaintiff started in July 1997 when the company was Ameritech before it was purchased by SBC.

Plaintiff Anton was hired as a Data Solutions Consultant (SC) in July 1999.  Her method of compensation was similar to Plaintiff Freeman Snipes, albeit with different commission rates and base salary.  Plaintiff Freeman Snipes and Plaintiff Anton worked on three CCI contracts prior to the June 2000 contract.

Commissions were paid on sales of equipment and on services.  Commissions on equipment varied on the item sold and was based on the gross margin – which is the sale price less cost and thus commissions were calculated using the net profit on the item.  Sale of services produced an ongoing monthly revenue for Defendant and had a different commission basis. Prior to going to Large Business, Plaintiff Freeman Snipes was paid commissions on services sold based on her then applicable commission (which periodically changed) multiplied by either the Life Cycle Revenue ("LCR") or the New Net Monthly Revenue ("NNMR") – which are equivalent for purposes of this litigation.[6]  The commission was computed shortly after the contract was signed and calculation of the commission would assume that the contract would be fully performed.  This litigation involves commissions on services and not on commissions on equipment.  While some of the sales activities involved filling in blanks on a form with boilerplate language, in larger deals, such as the 2000 CCI contract, neither Plaintiff was involved in the contract drafting process which was handled by Defendant's Contract Management Department.

In addition to some service contacts upon which Plaintiff Freeman Snipes was paid commissions (albeit at different rates) while she was a UAE  prior to the deals with CCI, both

---

[6]  Apparently multiplying the NNMR times the number of months in the contact's term equals LCR.

Plaintiffs were involved in three CCI contracts prior to the June 2000 CCI contract.

The first was the CCI T1 Service five year contract in November 1999, for 27 DSL lines and a monthly revenue of $986. Both Plaintiffs were paid commissions "on contract", using their respective commission rates, based on a LCR that assumed full performance. It is significant that this November 1999, T1 contract has a termination liability of only 75%, but the Plaintiffs' commissions were not based on 75% of the LCR but the full LCR. It is also significant that this contract was cancelled by CCI after a few months because it was folded into a slightly larger five year contract, the CCI's DS3 Contract, in January 2000 yielding a monthly revenue of $1,551.80. Again, both Plaintiffs were paid commissions "on contract", using their respective commission rates, based on a LCR that assumed full performance. Neither of the Plaintiffs were required to return the commission on the cancelled K1 contract that was superceded by the DS3 contract and each also got her usual commission on the DS3 contract that replaced it.[7]

The third was the five year CCI's Sonet OC48 Ring Contract of February 2000 with a $16,505 monthly revenue stream. It also has a reduced liquidated damages provision of $9,903

---

[7] While defense counsel initially thought that Plaintiff Freeman had approximately $15,000 backed out of her commission on the DS3 contract for what he thought was a recapture of her commission on the T1 contract, this is not the case. Her counsel notes that Freeman Snipes was paid $34,342.38 commission on the T1 contract, not the $15,219.25 that was backed out of the commission on the DS3 contract. There were certain renewal bonuses given to sales personnel for getting customers to renew service contracts. Obviously no renewal bonus would be owing on this cancellation of the T1 contract to sign the DS3 contract. Defense counsel, upon checking, acknowledges that the deduction of $15,219.25 was a negative Retention Compensation (it was labeled "RetComp") because the DS3 contract was originally reported as retention revenue and not new revenue. He acknowledges that once the mistaken retention bonus was removed (apparently by crediting its earlier payment), Plaintiff Freeman Snipes received a commission of $40,584.67 on the DS3 contract which was at her UAE commission rate of 2.4% because this was prior to her promotion to Territory Manager.

13

for each month remaining in the term if the agreement was terminated.  Again, Plaintiffs contend they were paid their respective commissions on contract, using a LCR that assumed full performance with no reductions because of  the lower liquidated damages provisions.

## COLIN COMMUNICATIONS, INC. (CCI) CONTRACTS

| Contract | K1:  (Contract 1) Colin Communications, Inc. (T1 Service), November 1999 | K2:  (Contract 2) Colin Communications, Inc. (DS3 Contract), January 2000 | K3:  (Contract 1) Colin Communications, Inc. (Sonet OC48 Ring Contract), February 2000 | KID (Contract in Dispute): Colin Communications, Inc. (Contract in Dispute), June 2000 |
|---|---|---|---|---|
| Term | 60 months | 60 months | 60 months | 51 months |
| Commitment | Quantity: 27 lines Monthly Charge: $986 | $1,551.80/month | $16,505/month | Minimum # of DSL Sevice Installed (End of Contract Year): Year 1 -  180,000 Year 2 - 360,000 Year 3 - 540,000 Year 4 - 750,000 |
| Termination Liability | 75% of the terminated portion of the monthly rate for the remaining term of the agreement | Termination Charge: Difference between the monthly rates, for the term plan Customer would have completed and Customer's Monthly Charges at the time of termination, multiplied by the number of months Service was installed.  Add Non-Recurring Charges that were originally waived.  If termination is in the 1st 12 months, add 40% of the 12 month rates, multiplied by the months remaining in the 1st year of the term plan. | Liquidated Damages of $9,903.00 for each month remaining from the time of termination. | Must pay for service up to the effective date of termination and pay the minimum volume commitment multiplied by the Monthly Charge for 768 Kbps for each month remaining in the Term of the Agreement, as liquidated damages. |

Based on these contracts, and for Plaintiff Freeman Snipes her earlier commission payments on services sold, as well as the other representations made to Plaintiffs noted in the earlier Report and Recommendation, a reasonable fact finder could conclude that the respective Plaintiffs had an implied in fact contract with Defendant to pay commission (1) on contract, (2) based on a LCR that (3) assumed full performance, and (4) no reduction or recoupment was imposed if the contract had a lower than 100% liquidated damages provision or if the contract was later cancelled.

VI. The Indeterminancy of the June 2000 CCI  DSL Contract:

In considering the difference between CCI wholesale DSL contract with prior contracts, the prior contracts could calculate the Life Cycle Revenue "on contract" and, assuming full performance, with an exactness and certitude.  This precision is not available on the CCI wholesale DSL contract because of its indeterminacy as to when DSL lines would be sold by CCI and when the lines would be installed and generate monthly revenues for SBC on which any LCR could be measured.

Defendant asserts that this difference is fatal to Plaintiffs' implied in fact contract theory because there was no meeting of the minds on how the contracts would be valued to arrive at an LCR for commission purposes.  Defendant argues that Plaintiffs proffer nothing beyond other people's guesses and their own speculation on the issue of how the LCR on the CCI contract would be measured.  At her deposition Plaintiff Freeman Snipes did not know what "LCR" was, how it was determined or who determined it on a particular contract.  Plaintiff Anton also apparently did not have her own conception of how LCR was calculated, but knew CCI committed to purchasing 750,000 DSL lines, though she could not point to the contract language

16

on this issue.  As noted above, neither Plaintiff was involved in the actual contract drafting

process on certain contracts and their services were essentially completed prior to that final

contract being drafted.

In contrast to the asserted uncertainty on the number of lines CCI was committed to

purchasing during each of the 51 months of the contract, Defendant claims its $15 million

minimum revenue commitment can be derived from clear and precise language in Section 5 of

the CCI contract.  Accordingly they argue that this amount is the appropriate LCR measure on

which Plaintiffs' commissions should be calculated.  Again, the answer to this question of how

the CCI contract is valued for purposes of calculating Plaintiff's commissions is not determined

solely from the language of the CCI wholesale DSL contract, but also from consideration of the

course of dealing between SBC and each of the Plaintiffs.

VII. Plaintiffs' Straight Line Model

Plaintiffs' proposed Exhibit 28, Plaintiffs argue, is a demonstrative aid (and any

accompanying testimony) depicting a Straight Line LCR Model which should be allowed

because it does not involve speculation or uncertainty.  Plaintiffs represent the exhibit as being

"time lines" or "flow charts" of the increasing value of the CCI Agreement over its life.  This

economic model "takes the anticipated number of DSL lines to be ordered over the life of the

contract" and then arrives at the LCR or value of the contract if CCI ordered an even number of

lines every month until the goal was achieved (Plaintiffs' response to Defendant's motion in

limine, at p. 25).

At the hearings on this matter, Plaintiffs' counsel acknowledged that they did not have an

expert to explain and introduce this proposed Exhibit 28 and its factual basis, but asserted that it

17

was premature to determine if they could lay a foundation for its introduction and use until trial.

Plaintiffs seek an opportunity at trial to lay a foundation regarding the assumptions on the start

up and evolution of sales and installations of DSL lines involved a under the CCI contract.  To

do so they will need to introduce evidence concerning the practices and understandings of the

parties regarding the development, marketing, and other factors concerning the installation of

DSL lines if the jury is to determine by a preponderance of the evidence that the parties had an

implied in fact understanding that Life Cycle Revenue of the June 2000 CCI contract would be

calculated based on such assumptions on market growth.  Such evidence likely would include

the potential geographical areas targeted for sales, whether all have available telephone or other

lines from which SBC can connect DSL service, what type of marketing is utilized in selling

these lines, what the start up and take up rates are or have been for SBC's DSL lines in other

geographic areas, what competition is available in each geographical area for alternate sources of

internet service, what marketing and servicing resources are available to CCI (this may be

speculative if CCI  had limited employees as one memorandum indicated).  Absent far more

information about the sales and marketing of DSL lines, it would not be possible to determine

what the rate of growth of DSL line service in the area covered by the CCI contract would be.

While the task to lay such a foundation will be difficult, it is determined that the issue of

whether Plaintiffs can lay a proper foundation for the introduction and/or use of Exhibits 27 and

28 is deferred until trial.[8]

---

[8] The Court may wish to set a date in advance of trial for Plaintiffs to make a proffer of
the evidence they anticipate will lay an adequate foundation for the admission and/or use of
Exhibit 27 and 28 at trial so the Court can make a ruling on whether the foundation evidence is
sufficient.

18

Yet, further comment is appropriate to set a framework on the damages issue.  Because the agreement on compensation and its method of calculation is based on an implied in fact contract, a review of those principles is appropriate.

VIII.   Implied in Fact Contracts:

In an express contract parties mutually exchange actual promises with assent manifested through direct or explicit words or actions, the existence and terms of an implied in fact contract, on the other hand, arises through implication or deduction from conduct, language used, or other circumstances evidencing an agreement. *Miller v Stevens*, 195 N.W. 481, 482 (Mich. 1923); *R&D Dist. Corp. v. Health-Mor Indus., Inc.*, 118 F.Supp. 2d 806 (E.D. Mich. 2000).  In an implied in fact contract, the agreement is manifested  by "looking at all the facts and circumstances to evaluate the intent of the parties." *Rowe v. Montgomery Ward & Co.*, 437 Mich. 627, 639 (1991).

Both the formation of and assent to terms of implied in fact contracts are interpreted objectively. "In determining whether parties have assented to a contract, the Court must apply an objective test, asking whether the expressed words of the parties and their visible acts would lead a reasonable person to conclude that they mutually assented to be bound." *R&D Dist. Corp.*, 118 F. Supp. 2d. at 809. Terms must be supplied objectively, looking at words and conduct. "The starting point in analyzing oral statements for contractual implications is to determine the meaning that reasonable persons might have attached to the language, given the circumstances presented." *Rowe,* 437 Mich. at 640 (Mich. 1991).

For contractual interpretation, courts look to the outward evidence manifested to the other party, i.e., from the position of a reasonable person in the other party's position. *Rood v.*

19

*Gen. Dynamic Corp.,* 44 Mich. 107, 119 (1993).  Expressions of inward, subjective intent that

conflict with outward evidence or with the other party's intent do not preclude contract

formation.  *Am. Louisiana Pipe Line Co. v. Gulf Oil Corp.*, 180 F. Supp. 155, 160 (D. Mich

1959) ( "Contracts are made by what parties say, and not what they intend to say.").  A party

cannot intentionally or recklessly mislead the other party through its use of words and escape a

contract by proving its own intent.  *Banque de Depots v. Nat'l Bank of Detroit*, 491 F.2d 753,

756 (6th Cir. 1974).  An injured party seeking action for an innocent misrepresentation, however,

must prove that the misrepresenting party benefitted from the injury. *Id.; see, e.g.*, *Kroninger v.*

*Anast*, 116 N.W. 2d 863 (Mich. 1962).  Practical determination of the implied contract by the

parties is an aid in determination of its terms by courts, but a "one-sided, self-serving

interpretation by one party is of no help in interpretation.  Acquiescence by the other party is

required to establish a practical construction . . ." *Davis v. Kramer Bros. Freight Lines, Inc.*, 361

Mich. 371, 375 - 376 (1960).

Implied-in-fact contracts may incorporate certain writings as part of the agreement.  Here

Defendant contends that while the 1999 and 2000 Sales Compensation Plans were not express

contracts, they did contain provisions for the Large Sales Exception and the prerogatives of the

Sales Compensation Team to make final decisions on compensation, and these limits were part

of any implied or other contractual relations with Plaintiffs.  If either Plaintiff had actual notice

of these provisions or reasonable notice and access to them, even if not read, they would be

bound by these limitations even if SBC added them later but sufficiently in advance of the CCI

wholesale DSL deal to provide fair notice.[9]  These are disputed facts to be determined at trial.

If the jury resolves this issue on the large sale exception and Sales Compensation Team authority in Plaintiffs' favor, then the questions that must be addressed is whether and what was the agreement on calculating Plaintiffs' commissions?  The earlier Reports and Recommendations, adopted by this Court,  granted Defendant summary judgment on any express contract claim that the method of calculating the LCR was expressly agreed to and included as a material term of the contract.  Thus, the jury will need to determine whether viewed objectively a reasonable person in the position of each Plaintiff would have interpreted the SBC's statements or conduct from their course of dealing to have believed there was agreement on the method of computing compensation. *Rood v. Gen. Dynamic Corp*. 444 Mich. 107, 119 (1993).

When this case is tried, the apparent uncertainty of Plaintiff Freeman Snipes knowing what "LCR" was,  how it was determined, who determined it on a particular contract and Plaintiff Anton's lack of clarity on how LCR was calculated even knowing CCI was committed to purchasing 750,000 DSL lines, may be dominant facts in a jury's thinking that will prevent a

---

[9] An implied in fact contract can be defeated or modified by express contracts covering the same terms. *Scholz v. Montgomery Ward & Co.,* 437 Mich. 83 (Mich. 1991).  In this case involving a employee suing an employer for terminating her for refusing to work on Sundays, the Michigan Supreme Court  wrote:

> Plaintiff . . . argues that defendant acquiesced in her refusal to work Sundays, thus creating a contract implied in fact that she not be terminated for such refusal. Regardless of whether an implied contract arose, as a matter of law, it did not apply to Plaintiff at the time she was discharged because the express modified contract . . . was in effect at the time of her discharge. An implied contract cannot be enforced where the parties have made an express contract covering the same subject matter. *In re De Haan Estate,* 169 Mich 146; [***15]  134 NW 983 (1912); *Steele v Cold Heading Co*, 125 Mich App 199, 202-203; 336 NW2d 1 (1983); *Hickman v General Motors Corp,* 177 Mich App 246, 251; 441 NW2d 430 (1989).

*Id*. at 93.

jury from finding that Plaintiff had an implied in fact agreement over the amount to which their respective commission rate was to be applied.

Yet, both Plaintiffs contend that based on a past course of dealing with SBC it was clear that the uniform practice of calculating commissions was (1) calculate if shortly after the contract was signed, (2) based on the contract as written, (3) apply the commission rate to a valuation of the contract and (4) that valuation was based on an assumption that the contract would be fully performed, and never was the commission or contract valuation based on some lesser amount that assumed non-performance of the contract.

Thus, while neither Plaintiff may know the precise terms and methods of calculating the value of the contract upon which her commission is applied, it may be that a jury could find that the course of dealing demonstrates that there was agreement on the fact that the method of calculation was performed shortly after the contract was signed (and not throughout or after it was performed) and there was agreement that the method of calculation uniformly applied the commission to a valuation of the contract over its term that valuation always assumed full performance of the contract and not non-performance even if there was a liquidated damages provision awarding smaller than full performance contract damages and even if the contract was not fulfilled.

As noted in the March 2004 Report and Recommendation where there is agreement on the core terms of a contract, uncertainty on certain details may not be fatal.  *See Butler v. Atwood*, 369 F.2d 811, 816 (6th Cir. 1966) ("Courts do not favor the destruction of contracts because of indefiniteness and hold that uncertainty may be removed by subsequent acts, conduct, declarations, or agreements of the parties."); *M & C Corp. v. Erwin Behr GmbH & Co.,* 143 F.3d

22

1033, 1039-40 (6th Cir. 1998) (stating that courts will rarely deny enforcement of a contract because of indefiniteness or missing details). Thus, one could have an implied in fact contract where (1) the commission is based on a set commission rate times some measure of the value of the contract over its term, (2) this commission is calculated shortly after the contract was signed and before it was performed, but (3) the calculation assumes full performance of the contract and not non-performance. If this were found to be the case, the employer would be contractually bound to its employee to value the contract with its customer using some method that anticipates performance of the contract by that customer, and not non-performance. While there may be certain other factors on which the employer may not be bound and may have some area of discretion in calculating the employee's compensation, it would have to select a method of valuation that fell within parameters that anticipated full performance of the contract by the customer, and not non-performance.

If one were to assume a jury made such a finding, would there be sufficient agreement on all material and essential terms necessary to form a contract?[10] Here the Plaintiffs contracted to perform certain services in exchange for certain compensation including a commission on the sales. On Plaintiffs' side of the agreement, there is no dispute by SBC that they performed the services contracted for. On the Defendant's side of the contract, looking at the 2000 CCI contract and the parties past course of dealing, could a jury find agreement on all essential terms for determining the LCR "on contract"? Defendant is correct that the jury determination cannot be pure speculation on damages. They are not to arrive at what they think is a fair compensation,

---

[10] *Cf.* In a different context, the Sixth Circuit has noted that courts can enforce a settlement contract when parties have agreed on the essential and material terms. *Brock v. Scheuner Corp.*, 841 F.2d 151, 154 (6th Cir. 1988).

23

but rather whether the parties agreed to a formula of compensation and a means for determining

Life Cycle Revenue.  It is possible that the Defendant has some discretionary room for

determining Life Cycle Revenue, but the jury will need to determine if the appropriate figure

must fall within parameters of a Life Cycle Revenue that anticipates full performance under the

contract, or whether the Defendant is correct it can chose a LCR of $15 million that assumes

total non performance. Yet, as with employment cases involving front pay, the speculative nature

of those damages does not automatically preclude an award of such damages particularly when

the wrongdoer has caused the uncertainty. [11]

---

[11]

As noted in *Whittlesey v. Union Carbide Corp.,* 742 F.2d 724, 728 (2nd Cir. 1984):

> While we agree that an award of future damages carries with it some risk of uncertainty and may, indeed, be speculative in some cases, we do not believe the risk to be so great as to preclude automatically front pay in every case. District courts have had considerable experience with damages for future wages in employment contract and personal injury cases, *see Koyen v. Consolidated Edison Co. of New York, Inc.,* 560 F.Supp. 1161, 1167-69 (S.D.N.Y.1983), as well as front pay cases under Title VII, *see, e.g., EEOC v. Kallir, Philips, Ross, Inc.,* 420 F.Supp. 919, 926-27 (S.D.N.Y.1976), *aff'd,* 559 F.2d 1203 (2d Cir.), *cert. denied,* 434 U.S. 920, 98 S.Ct. 395, 54 L.Ed.2d 277 (1977).

*Buckley v. Reynolds Metals Co.*, 690 F.Supp. 211, 216 (S.D.N.Y.,1988) notes:

> The final *Whittlesey* criterion requires that the calculation of front pay damages not involve "undue speculation." This is not to say that any level of uncertainty in the calculation is forbidden. By its nature, an assessment of future damages will always involve some uncertainty. Moreover, defendant will not be heard to complain of uncertainty when that uncertainty has been caused by its own acts. *See, e.g., Koyen v. Consolidated Edison Co.,* 560 F.Supp. 1161, 1169 (S.D.N.Y.1983) (Weinfeld, J.) ("the wrongdoer shall bear the risk of the uncertainty which his own wrong has created").

As noted in *Buckley* and other cases that front pay is often permitted for older employees where the work wife is 10 or fewer years.  *Davis v. Combustion Engineering, Inc.*, 742 F.2d 916, (6th Cir. 1984)(upholding an award of front pay to a 59 year old plaintiff but noting that front pay for a 41 year old plaintiff until retirement age might be unwarranted ).

While implied in fact contracts generally provide recovery of reasonable value of the service rendered, again it must be noted that in this case the jury is not free to substitute its judgment for what they think is "just" or "fair" compensation. [12] Here Plaintiffs' claims are specifically that SBC's breached their employment contract in the manner in which SBC calculated Plaintiffs' compensation. If the jury determines that Plaintiffs' had such an implied in fact contract, the measure of damages would be a calculation of damages that would not breach the implied in fact agreement. Any damages greater than that amount would overcompensate Plaintiffs.

IX.  Possible Implied in Fact Contracts on LCR

Even though the actual number of DSL  lines installed each month under the June 2000 CCI contract is  indeterminate there would be no dispute here had there been an agreement between the respective parties that SBC would compute LCR for application of Plaintiffs' respective commission rates(a.) "on contract,"  by (b.) using a minimum target numbers

---

[12]

*Wrench LLC v. Taco Bell Corp.,* 256 F.3d 446, 456-457 (6th Cir. 2001) notes:
> Under Michigan law, a plaintiff's remedy for breach of an implied-in-fact contract includes recovery of the reasonable value of the services rendered, considering factors such as the general practice of the industry. See Rockwell & Bond, Inc. v. Flying Dutchman, Inc., 74 Mich. App. 1, 253 N.W.2d 368, 372  [*457]  (Mich. Ct. App. 1977); see also Johnson v. Jones, 921 F. Supp. 1573, 1586 (E.D.Mich. 1996), rev'd in part on other grounds, 149 F.3d 494 (6th Cir. 1998); Comber Tool and Mold Engineering, Inc. v. General Motors Corp., 853 F. Supp. 238, 242 (E.D.Mich. 1993).

Yet,  here the unjust enrichment and *quantum meruit* arguments have been rejected by earlier decisions of this Court and Plaintiffs remaining claim is that Defendant's method of calculating their compensation breached the contract they had with SBC that their commissions would be applied to  valuation of the contract over its term assuming full performance.

25

identified under Plan Level D in Section 2.3 of the contract, and (c.) using a "straight line" average cumulative progression of DSL lines per month similar to the model demonstrated in Plaintiff's proposed Exhibit # 28.  As determined by this Court earlier, there is no such *express* contract in this case, and it is an open question whether Plaintiffs can produce sufficient foundation evidence to allow a jury to find such a contract on an implied in fact theory, although they wish to have that opportunity retained until trial.   Yet, this first hypothetical would clearly be an enforceable contract with agreement on all essential and material commission terms.  This case involves the question of what lesser degree of specifics in an agreement would  still be sufficient to have a binding implied in fact contract?

It seems that the parties could have a second  hypothetical contract in which the employer has a degree of discretion in determining  LCR for commissions so long as it is done (a) "on contract", (b)  fairly approximates a reasonable rate of market development based on custom and experience in  the DSL industry, and (c) assumes full performance with the Minimum Number of DSL Service Installed under the respective plan chosen in the contract. .  In this second hypothetical, the terms for figuring LCR for commission calculations are also sufficiently precise to have a binding contract where "a reasonable rate of market development" could be data derived within reasonable parameters of certainty based on past market experience in the DSL industry.   Under such a hypothetical contract, assuming certain known standards and marketing experience in the DSL field, the employer would likely have a degree of discretion to chose a straight line cumulative  progression per month model like Plaintiff's proposed Exhibit #28, or alternatively a less generous slanted "S" curve model assuming a slower period of start up, a peak period, and then a later trailing off of sales as the DSL market gets saturated.   But even

with some scope of discretion, the employer in this hypothetical  would be constrained by the

contract not  to select an artificial market development model.  This would eliminate a market

model  that approached zero lines sold each month or one that minimally met targets on the last

day of each contract year (but had no sales on the prior 364 days) because "all sales" happening

"on the last day" is an unrealistic assumption in the context of market experience in  the DSL

industry and would thus violate contract term "(b.)".   Yet, while actual markets for selling DSL

services would not anticipate this, that does not preclude a commission system that used such an

assumption.

One could assume a third hypothetical contract where the parties agreed to the second

hypothetical but relaxed the final set of constraints by excluding  contract term "(b.)" –  the

"fairly approximates a reasonable rate of market development."  This third hypothetical contract

would give the employer a far broader discretion to determine the market rate of development in

determining the LCR.  The employer would be unconstrained by actual past market experience

in the DSL industry and  constrained only by the requirement that (1) LCR  be determined "on

contract" and  that (2) it assumes full performance with the Minimum Number of DSL Service

Installed under the respective plan chosen in the contract. The fact that the employer retained a

broader area of discretion in determining when targets are met for determining LCR – even to

the point of using *minimum compliance* with meeting targets based on non-historical

assumptions that they were only met on the last day of each contract year (with no earlier

additional sales for the prior 364 days of that year) – would not be fatal to such a contract being

formed.

Thus, the question can be reframed to ask what is the minimum measure of valuation of

27

the June 2000 CCI contract over its term assuming full performance that would not breach the implied in fact agreement?   If the  jury finds there was an implied in fact contract that included a full performance assumption in calculating LCR,  it's task is then  to determine objectively from the evidence, if it can, what minimum performance of CCI could Defendant use that would not be in breach of its employment contracts with Plaintiffs.  Where there is a range of possible performances by CCI that would constitute "full performance" by it  of the CCI contract,  the jury may ultimately conclude that the marketing evidence,  course of dealing, customs in the trade, etc are not sufficient to compel SBC to adopt a CCI performance level that anticipates anything more than *minimal* performance by CCI.   Thus they would then reject Plaintiffs' formula proposed in Exhibit 28.   Yet, even if a jury rejects the concept of Plaintiff's proposed straight line model, it could nonetheless find that the parties *did agree* to a method assuming full performance, but as in hypothetical three, Defendant can select a minimum  LCR so long as it assumes at least  *minimum* full performance and  not non-performance.

In light of the past experience with the T1 CCI contract, its reduced 75% liquidated damages provision, and the fact it was cancelled, and in light of the other CCI  contracts  before June 2000, including the OC48 Ring with its lower liquidated damages provision, a jury could conclude that there is an implied in fact contract that excludes use of an LCR that assumed  non-performance as does  the non-performance $15 million LCR that the Defendant asserts.  On this evidence is seems a jury could conclude there was an implied in fact contract that Plaintiff be paid on contract, using an LCR that anticipates full performance, even if that is *minimal* performance under the contract. Then Defendant SBC would have been free in fulfilling its compensation contract with Plaintiffs to exercise its discretion to value the June 2000  CCI

28

contract over its 51 month term anticipating minimum "full performance" by CCI, but Defendant could not use a model that assumes  "non-performance."

Based on the facts of this case and the course of dealing among the parties, it seems a jury could conclude that full performance means that CCI  meets the Minimum Number of DSL Service Installed under Plan D in Section 2.3 by the dates set in the contract.  If a jury so decides, then resolving all doubts about  market development timing issues in Defendant's favor, this *minimal* full performance for determining LCR can objectively be determined from the contract by assuming that CCI met the Minimum Number of DSL Service Installed under Plan D on the last day of each year.  The LCR would then be computed as $0 in year one, $30  x 180,000 for year two, $30  x  360,000 for year three, and $30 x 540,000 for the final year four. Alternatively, if the jury resolves the implied in fact contract issue in Plaintiff's favor that the LCR must assume full performance, it seems that under the June 2000 CCI contract full performance *at minimum* would entail avoiding any of the liability  under Sections 4 or  5.[13] Resolving all market development timing issues on DSL market growth in Defendant's favor, but respecting the implied in fact contract requirement of *minimal* full performance,  CCI could avoid all liability by achieving  95% of the targets for Plan D in Section 2.3 on the last day of each contract year. Under that determination,  the LCR would be objectively computed from the CCI contract as $0 in year one, $30 x 95% x 180,000 for year two, $30 x 95%  x  360,000 for

---

[13] Shortfall Liability in Section 4 of the CCI contract is avoided at 95% of the Minimum Number of DSL Service Installed for each Plan Level set out in Section 2.3. To avoid the Volume Threshold Failure Liability in Section 5 the customer must by the end of month three of year three meet  60% of the Minimum Number of DSL Service Installed for the end of year two.

year three, and $30 x  95% 540,000 for the final year four.[14]

While Plaintiffs wish and are granted the opportunity to lay a foundation for their Exhibit 28 or some variation of a straight line market growth model, this further analysis addresses the question that was not specifically analyzed in the prior Report and Recommendation on whether there is sufficient evidence from which a reasonable jury could find an implied in fact contract between the parties including a means of determining the LCR for calculating damages.  The above analysis suggests that the evidence including  the June 2000 CCI contract are sufficient. Even resolving many uncertainties on the rate of DSL market growth in Defendant's favor, a reasonable fact finder could find an implied in fact contract between the parties and a means of measuring minimal full performance for determining the LCR and for calculating  appropriate commissions for each Plaintiff.  Thus, summary judgement on that issue is not appropriate. Many unresolved issues of whether the Plaintiffs had reasonable access or actual access to the 1999 or 2000 Sales Compensation Library, whether the parties entered into an implied in fact employment contract, whether that implied in fact contract embraced a contract like the wholesale DSL contract,  and whether it included a means of determining LCR under that June 2000 CCI contract must be determined by a jury.

This issue is analyzed here because it will likely be challenged, and such challenge best be done now and not during the trial.

_____

[14] Meeting 60% of  the year two Minimum Number of DSL Service Installed for Level D by the end of the third month of year three would allow CCI avoid the Volume Threshold Failure Liability under  Section 5.  But,  if it only achieved this 60% level of sales it would incur Shortfall Liability under  Section 4, and thus this 60% scenario would not be minimal full performance to avoid liability even though the measure of liability is only  the difference  of monthly charges that are  $35 for Plan Level A, $34 for Plan Level B, $32 for Plan Level C and $30 for Plan  Level D.

Any objections to this Opinion and Order  shall be filed by October 31, 2006.  Any objections are required to specify the part of the Order to which the party objects and state the basis of the objection.  E.D. Mich. LR 72.1.  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.  Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall be not more than twenty (20) pages in length unless by motion and order such page limit is extended by the Court.  The response shall address specifically, and in the same order raised, each issue contained within the objections.

So Ordered.

Dated: September 29, 2006                              s/Steven D. Pepe_____
Ann Arbor, Michigan                                    United States Magistrate Judge


Certificate of Service

I hereby certify that copies of this Order were served upon the attorneys of record by electronic means or U. S. Mail on September 29, 2006.

                                                       s/John Purdy_____
                                                       Deputy Clerk